# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE #1, in his own capacity and   **:**
as parent of child DOE 1, *et al.*,   **:**
  **:**
      **Plaintiffs,**   **:**
  **v.**   **:**   **3:21-CV-1778**
  **:**   **(JUDGE MARIANI)**
**DELAWARE VALLEY**   **:**
**SCHOOL DISTRICT**, *et al.*,   **:**
  **:**
      **Defendants.**   **:**

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Plaintiffs' "Motion for 1) Temporary Restraining Order; 2) Order Restraining the School Board of the Delaware Valley School District and the Board Members; and 3) Order to Show Cause why a Preliminary Injunction Should not Issue" (Doc. 5).

On October 18, 2021, Plaintiffs, consisting of five John/Jane Does, filed a "Complaint for Declaratory and Injunctive Relief for Violations of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Constitutionally Protected Due Process Rights under 42 U.S.C. § 1983" (Doc. 1), naming as Defendants the Delaware Valley School District ("DVSD") and DVSD Board of Directors Jack Fisher, Jessica Decker, Dawn Bukaj, Brian Carso, Cory Homer, Pan Lufty, Felicia Sheehan, and Rosemary Walsh, each in their individual and official capacities. Plaintiffs' Complaint alleges "Discrimination on the Basis of

Disability in Violation of the ADA" (Count I); "Violation of Section 504 of the Rehabilitation Act of 1973" (Count II); "42 U.S.C. § 1983 – Violation of Substantive Due Process (5th and 14th Amendments)" (Count III); "42 U.S.C. § 1983 – Violation of Substantive Due Process (Fourteenth Amendment)" (Count IV); "42 U.S.C. § 1983 – Right to Free Association (First Amendment)" (Count V); and "Violation of Fundamental Rights Protected under the Pennsylvania Constitution" (Count VI).  (Doc. 1).  Plaintiffs' Complaint further contains a "Request for Temporary Restraining Order and Preliminary Injunction".  (*Id*. at ¶¶ 175-176).

On October 18, 2021, Plaintiffs also filed a "Motion for 1) Temporary Restraining Order; 2) Order Restraining the School Board of the Delaware Valley School District and the Board Members; and 3) Order to Show Cause why a Preliminary Injunction Should not Issue" (Doc. 5) and supporting brief (Doc. 6), to which Defendants have filed briefs in opposition (Docs. 17, 18).  Plaintiffs' Motion requests the following relief:

> [1.] Vacate and set aside the September 28, 2021 vote of the School Board to permit a current policy of optional masking, based upon a parent's signature without medical documentation while students are attending school, and while riding on school buses in violation of the Order of the CDC January 29, 2021 and adherent policy, the August 31, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health, and the September 10, 2021 Directive from the Pennsylvania Department of Education, as well as any other action taken by Defendants to rescind the universal masking policy in school and while riding school buses;
>
> [2.] Declare that the Defendants' Health and Safety Plan as modified on September 15, 2021, is void and without legal force or effect to the extent it is in violation of the Order of the CDC January 29, 2021 and adherent policy, the August 31, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health, and the September 10, 2021 Directive from the

Pennsylvania Department of Education and the American with Disabilities Act and Section 504 of the Rehabilitation Act;

[3.] Declare that the policy of the School District created by the Board Members' vote on September 28, 2021, which is in contradiction to CDC and State governmental entity guidelines, [is] invalid and any and all actions taken by Defendants in violation of the Order of the CDC January 29, 2021 and adherent policy, the August 31, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health; and the September 10, 2021 Directive from the Pennsylvania Department of Education, and the American with Disabilities Act and Section 504 of the Rehabilitation Act, are found to be arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

[4.] Declare that the failure to abide by the Order of the CDC January 29, 2021 and adherent policy, the August 31, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health, and the September 10, 2021 Directive from the Pennsylvania Department of Education and other actions taken by Defendants to void the State and Federal universal masking policies are in violation of the Constitution and contrary to the laws of the United States and in violation of the American with Disabilities Act and Section 504 of the Rehabilitation Act;

[5.] Declare that the failure to abide by the Order of the CDC January 29, 2021 and adherent policy, the August 31, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health, and the September 10, 2021 Directive from the Pennsylvania Department of Education, and other actions taken by Defendants are in violation of the ADA and Section 504 and contrary to the laws of the United States;

[6.] Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing a policy contrary that violates the ADA, Section 504, the Order of the CDC January 29, 2021 and adherent policy, the August 31, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health, and the September 10, 2021 Directive from the Pennsylvania Department of Education and from taking any other action to enforce such school district policy that is not in compliance with applicable law;

> [7.] Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing a policy contrary to in violation of [*sic*] the Order of the CDC January 29, 2021 and adherent policy, the August 31, 2021 Order of the Acting Secretary of the Pennsylvania Department of Health, and the September 10, 2021 Directive from the Pennsylvania Department of Education, for COVID-19 relief and from taking any other action to rescind such policy that is not in compliance with applicable laws. . .

(*See* Plaintiffs' Proposed Order, Doc. 5-1, at 3-5).[1]

The Court issued a Temporary Restraining Order on October 20, 2021, enjoining and restraining the Defendants from

> failing or refusing to comply with the Pennsylvania Department of Health August 31, 2021, Order requiring universal masking with identified exceptions . . . and the September 21, 2021, Directive from the Pennsylvania Department of Education reinforcing with School District that parents do not have an option to except their children from the Department of Health Order unless the parental waiver form is supported by medical documentation which provides verifiable medical proof that the student requires an accommodation from a health risk to the student cause[d] by mask wearing.

(Doc. 12, ¶ 2).

---

[1] To the extent that Plaintiffs request preliminary injunctive relief on the basis that Defendants are allegedly violating the CDC's Order requiring "persons to wear masks while on conveyances and at transportation hubs" due to COVID-19, which includes mandatory masking on all school buses, Plaintiffs did not provide <u>any</u> evidence that Defendants are not following the CDC's Order. Rather, all evidence presented during the hearing indicates that Defendants are enforcing mandatory masking on all school buses. (*See e.g.* Prelim. Inj. Hr'g, P-18 (Medical Exception Request form stating that "[t]his exception only applies to masking within schools [and m]asks are still required on school buses"); Test. of Bukaj, at 132). Therefore, the Court's analysis herein focuses on the Pennsylvania Department of Health's Order and the School District's subsequent resolution.

On October 28, 2021, the Court held an evidentiary hearing and oral argument on Plaintiffs' motion for preliminary injunctive relief. At the hearing, Plaintiffs presented the testimony of Dr. James Cruse, Plaintiffs Jane Doe #1, John Doe #1, Jane Doe #2, John Doe # 2, Jane Doe #3, and Defendants DVSD Board Directors Dawn Bukaj, Jack Fisher, and Brian Carso.  The following day, this Court extended its TRO for a period of 14 days or until its issuance of an Order ruling on Plaintiffs' motion for preliminary injunctive relief.  (Doc. 32).  The TRO is thus scheduled to expire on Friday, November 12, 2021.

However, on November 10, 2021, the Commonwealth Court of Pennsylvania issued a decision finding the "Order of the Acting Secretary of the Pennsylvania Department of Health Directing Face Coverings in School Entities", the Order at issue in the present case which Plaintiffs assert that Defendants have violated, to be "void *ab initio*" and unenforceable.  (*See* Doc. 38-1).  The Pennsylvania Office of the Attorney General, representing Pennsylvania Acting Secretary of Health Alison Beam, filed an appeal to the Pennsylvania Supreme Court that same day.  That appeal operates as an automatic *supersedeas* in favor of the Commonwealth, *see* Pa. R.A.P. 1736, and the Acting Secretary of Health's Order thus remains in effect as of the issuance of this Court's present memorandum opinion.

As a result of the automatic *supersedeas*, and the expiration of this Court's TRO on Friday, November 12, 2021, a decision on Plaintiffs' motion for preliminary injunctive relief remains necessary.[2]

Plaintiffs' motion (Doc. 5) having been fully briefed and an evidentiary hearing having been held, the motion is now ripe for disposition.  For the reasons that follow, Plaintiffs' motion for preliminary injunctive relief will be denied.

## II. FINDINGS OF FACT

1. On January 29, 2021, the Centers for Disease Control and Prevention ("CDC") issued an Order requiring "persons to wear masks while on conveyances and at transportation hubs" due to a "pandemic of respiratory disease (coronavirus disease 2019 or 'COVID-19') caused by a novel coronavirus (SARS-COV-2)."  (*see* Prelim. Inj. Hr'g, P-2) (hereinafter "CDC Order").

2. The CDC Order explained that "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within 6 feet) mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks."  (CDC Order, at 5-6). "Infected people without symptoms

---

[2] In ruling on Plaintiffs' motion for preliminary injunctive relief, this Court expresses no opinion with respect to the merits of the Commonwealth Court's decision, nor does the Court find it necessary to do so in light of this Court's opinion herein which assumes the validity of the Pennsylvania Department of Health's Order which this Court has found does not require medical documentation for securing an exception to the mask wearing requirement.

(asymptomatic) and those in whom symptoms have not yet developed (pre-symptomatic) can also spread the virus."  (*Id*. at 6).

3. According to the CDC Order, in addition to the ability of masks to "provide personal protection to the wearer by reducing inhalation of [virus-laden] droplets", "[m]asks help prevent people who have COVID-19, including those who are pre-symptomatic or asymptomatic, from spreading the virus to others" because "[m]asks are primarily intended to reduce the emission of virus-laden droplets, i.e., they act as source control by blocking exhaled virus."  (*Id*. at 6).

4. On August 31, 2021, the Pennsylvania Department of Health issued "Order of the Acting Secretary of the Pennsylvania Department of Health Directing Face Coverings in School Entities" (Prelim. Inj. Hr'g, P-11) (hereinafter "Pa. DOH Order").

5. The Pa. DOH Order stated that "because of the rise of the Delta variant [of COVID-19], increasing disease and hospitalizations, and the inability to obtain vaccines for a large part of that vulnerable group, children are more and more at risk" and set forth "several reasons for the increasing risk to children from COVID-19".  (Pa. DOH Order, at 1).

6. The Pa. DOH Order further explained:

> Maintaining in-person instruction at schools is imperative, since it has . . . been shown that in-person instruction and socialization are necessary for the health and well-being of our children.  In view of this serious concern for our nation's children, the CDC has issued a strong recommendation for masking of all persons, teachers, students and staff, within the nation's schools, regardless of vaccination status, to create a multi-layered approach

for fighting COVID and to keep our schools open for in-person education.  In addition, the American Academy of Pediatrics (AAP) has also strongly recommended masking in schools.  Finally, recent studies have shown that mask-wearing in schools has contributed to lower levels of COVID-19 transmission among students and staff and allowed for the continued in-person attendance.

 (*Id*. at 2).

7. Thus, "in order to prevent and control the spread of disease", Section 2 of the Pa. DOH Order set forth a "General Masking Requirement" directing "[e]ach teacher, child/student, staff, or visitor working, attending, or visiting a School Entity shall wear a face covering indoors, regardless of vaccination status, except as set forth in Section 3."  (*Id*. at § 2).

8. Section 3 of the Order set forth "Exceptions to Covering Requirement", which, in relevant part, provided an exception to the general masking requirement "[i]f wearing a face covering would either cause a medical condition, or exacerbate an existing one, including respiratory issues that impede breathing, a mental health condition or a disability."  (*Id*. at §3.B).  Section 3 nonetheless directed that "[a]ll alternatives to a face covering, including the use of a face shield, should be exhausted before an individual is excepted from this Order."  (*Id*. at § 3).

9. Section 4 of the Pa. DOH Order, "School Entity Obligations", requires that a "School Entity must":

 1. Require and enforce the requirements that all teachers, children/student, staff, and visitors (subject to the exceptions in Section 3) wear a face

covering indoors, regardless of whether this Order is reflected in a school entity's Health and Safety Plan.

. . .

4. Provide reasonable accommodations for individuals who state they have a medical condition, mental health condition, or disability that makes it unreasonable for the person to maintain a face covering.

 (Pa. DOH Order, § 4.A.1, §4.A.4).

10. The Pa. DOH Order took effect on September 7, 2021, and "remain[s] in effect until otherwise terminated."  (*Id*. at § 6).  As of the date of this Court's instant memorandum opinion, and accompanying order, the Pa. DOH Order remains in effect.

11. The website for the Pennsylvania Department of Education contains a webpage which "provides an overview of information, specific to COVID-19 and school communities, that has been added to/updated on the Pennsylvania Department of Education's (PDE) website."  (Prelim. Inj. Hr'g. P-13, at 1, 2).  The "Week of September 6 to 10" update includes a document entitled "September 10, 2021: Message to School Communities."

12. The September 10, 2021 "letter" is addressed to "Chief School Administrator[s]" and includes several "updates".  (Prelim. Inj. Hr'g. P-13, at 3) (hereinafter "Pa. DOE letter").

13. The Pa. DOE letter addresses the Pa. DOH Order and instructs that "this Order is not a mask optional policy.  Any school entity simply permitting a parent's sign-off without evidence that the student has a medical or mental health condition or disability that

precludes the wearing of a face mask is not in compliance with this Order." (*Id.*).  The

letter further states that:

> It is recommended that any exception [to Section 3 of the Pa. DOH Order]
> be in accordance with eligibility under Section 504 of the Rehabilitation Act
> or IDEA for such medical or mental health condition or disability.  School
> entities should follow their established processes for determining student
> eligibility under those laws, including any medical documentation that they
> would normally require.   There are exceptions to the Order; however, a
> parent's opposition to the Order is not one of them.

(*Id.*).

14. On September 10, 2021, an email, signed by Sherri Smith, the Acting Deputy

Secretary for the Pennsylvania Department of Education, Office of Elementary and

Secondary Education was issued which contained nearly verbatim language as the

Pa. DOE letter.  (Prelim. Inj. Hr'g. P-13, at 6-7).

15. On September 16, 2021, the DVSD held a Board Meeting in the DVSD Auditorium.

(*See* Prelim. Inj. Hr'g, P-15).  The Minutes of the Meeting state, in part, as follows:

> [DVSD Board Member] Dawn Bukaj asked to revisit the 504 Plan/mask
> exemption discussion.   The Department of Health order did not require
> medical proof.  Through policies and Section 504 of the Rehabilitation Act,
> we do not have the legal ability to require medical proof.  Anyone that has
> been denied has the right to appeal – due process.
>
> [Superintendent] Dr. Bell stated that our attorneys have advised the school
> district to follow procedures that were followed in the past such as our
> procedures for any student with a 504 Plan.  We have required doctors'
> notes in the past. He clarified that the district does not draft a 504 plan for
> students – they have same criteria for a medical exemption/accommodation
> as they would in a 504, another ADA issue or mask mandate that students
> got last year as well – following the same criteria as we used in the past for
> all those different accommodations/exclusions.  Dr. Bell read about medical

exceptions language from our attorneys Sweet, Stevens, Katz and Williams
– *Allowing a medical exception based solely on a parent's statement that
the face covering causes a medical condition or exacerbates one effectively
converts a face covering mandate into a face covering option, thus
undermining the goal and the intent of the Order. Relying solely on a
parental statement creates the situation where the school entity will be failing
to abide by the mandate of this Order in reliance upon the parent's
statement. If the decision to allow exceptions on that basis generates a
large number of exclusions which results in a significant spike in cases, the
board members and administrators may be placed in the position of having
to defend themselves against a claim that they engaged in willful
misconduct.*

   (*Id*. at 11-12) (italics in original).

16. The Board of Directors voted to table Bukaj's motion "to follow the Department of

    Health order with respect to mask exemptions and immediately terminate the

    requirement for 504 medical proof."  (*Id*. at 12).

17. On September 28, 2021, the DVSD held a "Special Board Meeting for the Purpose of

    Addressing the Department of Health Masking Order" (Prelim. Inj. Hr'g, P-16).

18. By a vote of 5-1, the DVSD Board of Directors approved the "Motion of the Duly

    Elected Members of the Delaware Valley School Board Regarding Face Coverings in

    School Entities".  (*Id*.).  Two Board of Directors were not present for the vote.

19. The Motion states as follows:

    Whereas, according to the Pennsylvania Department of Health website
    students with Asthma in Pike County comprise 7.99% of the school
    population and,

    Whereas, according to the Pennsylvania Department of Health website
    students with Attention Deficit Disorders comprise 5.71% of the school
    population and

Whereas significant other physical and mental health conditions and/or disabilities exist in the Delaware Valley School District and, lastly,

Whereas, in the various Policies of the Delaware Valley School Board (see Section 900) it is understood that the ultimate responsibility for the health and safety of each child rests with their parents' decisions concerning their child's individual circumstances.

As such, according to the Pennsylvania Department of Health Order dated September 07, 2021, the Acting Secretary of Health Alison V. Beam, has provided for eight exceptions to the face Covering Requirement.  Exception B. states "If wearing a face covering would either cause a medical condition, or exacerbate an existing one, including respiratory issues that impede breathing, a mental health condition or a disability."

Furthermore, according to said health Order provided under Section 4A.4, "A School Entity must: Provide reasonable accommodations for individuals who state they have a medical condition, a mental health condition, or disability that makes it unreasonable for the person to maintain a face covering."

Given these facts and circumstances, a motion will be accepted to continue following the Department of Health Face Covering Order, as written, such that Delaware Valley School Board directs the administration to accept as a reasonable accommodation, a signed written parent/guardian request for a medical condition exception, on a form provided by the district. No further documentation shall be required.

   (*Id*. at 1-2).

20. Following the vote by the DVSD Board of Directors, the "Student Face Covering –

   Medical Exception Request" form provided to parents/guardians of students within the

   DVSD allowed a parent/guardian to "request[] a medical exception from wearing a

   mask during school hours while indoors for my child due to the following eligible

   exception via Section 3 of the Order by the Acting Secretary of the Pennsylvania

Department of Health Directing face covering in School entities: . . . [1] If wearing a face covering would cause a medical condition[; or 2] If wearing a face covering would exacerbate an existing condition, including respiratory issues that impeded breathing, a mental health condition, or a disability."  (Prelim. Inj. Hr'g, P-18).  This form required a parent/guardian to check a box indicating which of the two afore-stated exceptions applied.

21. Unlike prior Student Face Covering exemption request forms provided by the DVSD in September, 2021, the post-September 28, 2021 Medical Exception Request form did not require that any medical documentation be provided in support of a parent/guardian's request for an exception for their child. (*See* Prelim. Inj. Hr'g, P-12 ("Student Face Covering – Temporary Exemption Request" requiring that parent/guardian "must submit appropriate medical documentation and have it approved by DVSD consistent with its current practice for medical accommodations" if requesting an exemption); P-14 ("Medical Certification for Student Face Covering Exemption" form to be completed by a physician, dated September 13, 2021)).

22. Pursuant to a federal order, masks are still required on all school buses.  (Prelim. Inj. Hr'g, P-18; Test. of Bukaj, at 132).

23. At the preliminary injunction hearing, Plaintiffs' first witness was Dr. James Cruse. Dr. Cruse, following voir dire, was accepted by this Court as an expert on infectious diseases and epidemiology.  (*See* Prelim. Inj. Hr'g, at 15).

24. All of Dr. Cruse's opinions were offered to a reasonable degree of medical certainty.

25. Dr. Cruse joined Wayne Memorial Community Health Centers in Honesdale, Pennsylvania, in 2014 and is now the Chief Medical Officer of Wayne Memorial Community Health Centers and Medical Director of Wayne Memorial Hospice Program.  (Test. of Cruse, at 6).

26. Dr. Cruse graduated from medical school at the Emory University School of Medicine in 1995 and completed a three-year residency program in Family Medicine at Emory University, finishing in 1999.  (*Id.* at 5).  Dr. Cruse did two rotations with the CDC, working in the Epidemiology Intelligence Service.  As a medical student, he also worked with the World Health Organization.  (*Id.* at 8-9).

27. Dr. Cruse is currently "doing some [COVID-19] antibody studies, looking at levels of antibodies in the community, as well as checking antibodies in our employees, after vaccination, and then six months later to see what their levels of antibodies are." (Test. of Cruse, at 12).  However, Dr. Cruse is not involved in any studies regarding masking, the effectiveness of masking, or the spread of COVID-19 in a school district. (*Id.*).

28. Due to COVID-19, Dr. Cruse's job responsibilities Wayne Memorial Community Health Centers "expanded dramatically" and he "became the point person for Wayne Memorial Community Health Centers and Wayne Memorial Hospital on COVID-19", did daily updates on COVID-19, "stay[ed] up to date, put[] out policies and information

for all of our providers to . . . standardize what we were doing throughout the organization, interact[ed] with the hospital and with the pulmonologist who headed up the COVID information at the hospital, worked with him closely on coming up with protocols for safety. . . ."  (Test. of Cruse, at 6-7).

29. In his job capacity, Dr. Cruse works with six area school districts, including the DVSD. (*Id.* at 7).

30. Beginning in the summer of 2020, Dr. Cruse worked "with all of [the area schools] in meetings to held establish their safety plan and continuing updates every two weeks . . . on the situation [and] what was going on with the hospital, community health centers and the schools."  (*Id.* at 7-8).  Dr. Cruse participated in "advisory meetings" with the DVSD during the process of helping to develop their health and safety plan. (*Id.* at 8).

31. Dr. Cruse opined that his knowledge of COVID-19 is "very extensive" and that he is "probably one of the most knowledgeable people in Wayne or Pike County about COVID-19."  (*Id.*).

32. COVID-19 is "respiratory-spread" and consists of "mostly respiratory droplets that travel about six feet, when a person speaks, coughs, sneezes, sings." (Test. of Cruse, at 9).

33. The COVID-19 Delta variant "is definitely more contagious than the prior variant", has resulted in many deaths, and "seems to be affecting [] children more".  (*Id.*).  Dr.

Cruse has seen "very large spikes in transmission and community spread" with the Delta variant.  (*Id.*).

34. Dr. Cruse explained that the hospital was "very busy in January, but it has been bad the past couple weeks."  (*Id.* at 10). The hospital has "the highest volume of COVID-19 patients than [it has] had at any point in the epidemic."  (*Id.* at 16). The Emergency Room at the hospital, and the hospital itself, is full due to a "very large spike in COVID-19 infections, along with other illnesses that were put off during the epidemic." (*Id.* at 15-16).

35. A "medically-fragile child" is "at much higher risk of death" if infected with COVID-19. (Test. of Cruse, at 16).

36. Further, "death does occur in children with COVID-19" but there are also "a lot of other disabilities" that occur as the result of COVID-19.  (*Id.*).  "For children, in particular, it's multi-inflammatory system failure . . . MISC, which is a lot like another disease called Kawasaki's disease that causes widespread inflammation, rashes, headaches, fever, kidney failure, heart damage, and can cause death."  (*Id.*).  There is also "a high rate of myocarditis in teens that get COVID-19."  (*Id.* at 17).

37. The Health and Safety Plan for the DVSD in July 2021 had a provision for optional masking.  (Test. of Cruse, at 21). At that time, "[t]he COVID rates were low . . . we were running 20 to 30 cases per 100,000 per week."  (*Id.*).  This rate of transmission is considered to be "moderate" according to the CDC, and the CDC only recommends

universal indoor masking "at 50 per 100,000 cases." (*Id.*). Dr. Cruse was not in agreement with the optional masking provision in the DVSD's Plan, but told the District at a meeting that "it is reasonable to start with optional masking, but if the rates increase, we need to go to mandatory masking." (*Id.* at 21-22).

38. The rate of COVID-19 infections rose throughout the month of August, 2021, and "by the last week of August, it was around 160 per 100,000 per week, well above the CDC's cutoff of" 50 per 100,000. (*Id.* at 22).

39. Following the increase of COVID-19 infections in August, 2021, the School District did not ask Dr. Cruse for a recommendation regarding masking, and he did not provide the DVSD with one. (Test. of Cruse, at 22-23; *see also*, *id*. at 33-34).

40. In September and October of 2020, there were a total of 10 confirmed diagnoses of COVID-19 among students and staff in the DVSD. (Prelim. Inj. Hr'g, P-20; Test. of Cruse, at 47). During this time, there was a mandatory masking order for schools in place issued by the Governor of Pennsylvania. (Test. of Cruse, at 47). (*See also*, Test. of Bukaj, at 144, 177 (agreeing that in 2020, there was universal masking in schools and the school district required medical proof for mask exemptions)).

41. In September and October of 2021, there were a total of 165 confirmed diagnoses of COVID-19 among students and staff in the DVSD. (Prelim. Inj. Hr'g, P-21; Test. of Cruse, at 48). This amounts to a difference of 1,650% between the number of

infections in September/October of 2020 and the number of infections in September/October of 2021. (Test. of Cruse, at 48).

42. Dr. Cruse opined that the number of infections in September/October of 2021 in the DVSD was "higher than you would expect, if the school was masked, if everyone was masked."  (*Id.* at 49).

43. Consistent with the reasoning set forth in the CDC's Order, Dr. Cruse explained that masking "is very important for the prevention of transmission of COVID-19" because masks "reduce the risk that I will spread COVID to you" and they "slightly reduce the risk that I will get COVID, if I'm wearing a mask. . ." (*Id.* at 34).  Masks operate as "source control" and "mostly function by preventing the mask-wearer from spreading the infection to someone else."  (*Id.*).

44. There is "significant evidence of decreased transmission of COVID-19 when everyone is wearing masks in schools."  (Test. of Cruse, at 28).

45. In Dr. Cruse's medical opinion, mandatory masking in school, and specifically in the DVSD, is important "[b]ecause of the very high rate of transmission in our area at that time [August, 2021]".  (*Id.* at 31).

46. Dr. Cruse opined that allowing students to not wear a mask in school, in the months of September and October, 2021, posed "a danger to other students and teachers and other people in that school."  (*Id.* at 43).  Specifically, "there's a high rate of

transmission this time of year, . . . very high rates in the community" and "[w]e definitely have had cases in the schools."  (*Id.*).

47. A child can also bring COVID-19 home from school and transmit the virus to parents or other individuals in the home. (Test. of Cruse, at 31-32).

48. Dr. Cruse has not seen any "peer-reviewed studies in reputable journals" that say that wearing a mask can harm children.  (*Id.* at 35).

49. For students with asthma, wearing a mask "is beneficial and it also protects them from COVID."  (*Id.* at 44).  There was a "significant decrease in asthma exacerbations last school year, when students were wearing masks." (*Id.* at 43).

50. Defendant Dawn Bukaj, a current member of the Board of Directors for the DVSD, (Test. of Bukaj, at 97), also testified at the preliminary injunction hearing.

51. Bukaj agreed that a school board member must be informed on an issue, and undertake a reasonable investigation on the issue, prior to casting a vote, and that his/her decision must be based on information gathered necessary to form an intelligent judgment.  (Test. of Bukaj, at 98).  She also agreed that a school board may adopt only reasonable rules and resolutions that it deems necessary.  (*Id.*).  Bukaj further explained that she thinks "the board is responsible to find information, absolutely, and to seek professional information."  (*Id.* at 99).

52. Bukaj acknowledged that a school board may also not make a decision which is irrational or arbitrary.  (*Id*. at 100).

53. Bukaj also agreed that a school board should "do what it can to protect health, safety and well-being of its students" and one of the board's duties is to "help protect the students from harming one another."  (Test. of Bukaj, at 102).

54. Bukaj stated that "a school board has every obligation to consider all recommendations from official agencies", including from the CDC and American Academy of Pediatrics. (*Id.* at 118-119).

55. Bukaj was unsure if she ever read the January 29, 2021 CDC Order. (*Id.* at 133).

56. Bukaj stated that she has read the Pa. DOH Order, dated August 31, 2021 and testified that she "took into consideration the entire document" when voting on the School Board's September 28, 2021 motion.  (Test. of Bukaj, at 115, 119).

57. Bukaj "believe[s] COVID is real" and that "it's very infectious."  (*Id.* at 110). She explained that her understanding of the harm a student could suffer if infected with COVID-19 is "anywhere from the sniffles and fever and flu-like symptoms to those who . . . can get very sick from it, if they have underlying conditions."  (*Id.* at 106).

58. However, Bukaj does not believe that unmasked children pose a direct threat to causing an increased risk of infection from COVID-19 to other students. (Test. of Bukaj, at 110).

59. Bukaj testified that she did not think that not wearing a mask increases the risk of spreading COVID-19 in the schools because the DVSD has taken other measures "to mitigate the virus" such as "air exchangers".  (*Id.* at 106-107).

60. When asked whether she agreed that masking would help new infections fall

    "significantly", Bukaj testified as follows:

    > . . . So I don't know if I can definitively say whether or not I believe,
    > personally, that masking helps stop the spread . . . but I can tell you that that
    > was not a consideration in the decision that I made regarding the current
    > stance and why we're here, which is to allow parents, under the Order, to
    > sign off on their child's need to not wear a mask . . . without medical proof.

    (Test. of Bukaj, at 140-141).

61. Instead, "[o]ne of the things that weighed heavily" in Bukaj's decision to vote in favor

    of the School Board's September 28, 2021 motion "was parents who were unable to

    get medical notes from their doctors. . ." (*Id.* at 122).  Bukaj opined that "some

    doctors . . . because of the group they work for, they've been given a directive that

    they can't provide mask exemptions, probably, liability issues, I would assume."  (*Id.*).

62. Bukaj further opined that if an unmasked student "is not sick, I don't see how they

    pose a threat" of transmitting COVID-19, but admitted that she would not know if a

    student was infected with COVID-19 or any other illness.  (Test. of Bukaj, at 108-109,

    110; *see also*, *id.* at 136 ("I don't know how we could tell that someone was spreading

    a virus if they didn't have symptoms, other than to look at the actual numbers for in-

    school spread.")).

63. Bukaj acknowledged that if a parent checked either box on the "Student Face

    Covering – Medical Exceptions Request" form, thereby stating either that "wearing a

    face covering would cause a medical condition" or that "wearing a face covering

would exacerbate an existing condition, including respiratory issues that impede breathing, a mental health condition, or a disability", the School District would not, "[b]ased on just this form", know the nature of the child's medical condition that necessitates the child's exemption from masking. (Test. of Bukaj, at 141-142; *see also*, Prelim. Inj. Hr'g, P-18).

64. Following the DVSD's issuance of a form which did not require medical documentation in order to obtain an exception, approximately 640 students were approved for a mask exemption, which constitutes approximately 14-15% of the student body.  (Test. of Bukaj, at 152).

65. Defendant John Fisher testified at the hearing and is a current member of the DVSD Board of Directors.  (Test. of Fisher, at 179).

66. Fisher agreed that masking helps to prevent transmission of COVID-19.  (*Id.* at 181). He further explained that this is "why we [the School Board] passed and agreed to the Department of Health's Order."  (*Id.* at 182).

67. Defendant Brian Carso, who testified at the hearing, is also currently a member of the DVSD Board of Directors. (Test. of Carso, at 187).

68. Carso testified that he "didn't see the need for" allowing parents to sign off without medical documentation and that the School District had the mask mandate the prior year "and people who had medical exemptions were able to get notes."  (*Id.* at 188).

69. According to Carso, "all the best advice we [the School Board] had, which included the best medical advice, legal advice from two expert law firms in the area of Education Law, advice from our insurance company and advice from the administration and teachers all pointed to . . . the resolution not having merit and not being a good idea."  (Test. of Carso, at 188; *see also*, *id.* at 191 ("the best counsel we got across the board was to adapt a universal masking policy.")).

70. Although Carso voted at the September 16, 2021 Board Meeting to table Bukaj's motion "to follow the Department of Health order with respect to mask exemptions and immediately terminate the requirement for 504 medical proof", he was absent from the September 28, 2021 Special School Board Meeting and therefore did not vote on the motion which the Board approved.  (*See* Prelim. Inj. Hr'g, P-15, at 12-13; Prelim. Inj. Hr'g, P-16).

71. Plaintiff Jane Doe #1 testified that she lives in the DVSD and has two children who attend school in the District. (Test. of Jane Doe #1, at 55).

72. Jane Doe #1's children are 13 and 14 years-old and in eighth and ninth grades respectively. (*Id.* at 56).

73. Jane Doe #1 explained that her ninth-grade daughter "is considered a medically-fragile student.  She has a neurological disorder that has led to intellectual and physical disabilities, she's cortically blind, she is non-verbal, she is fully dependent." (*Id.*).

74. Although her daughter was vaccinated in July, 2021, Jane Doe #1 learned from her doctor that "the test to determine her immune response to the COVID vaccine is still in an experimental stage" and "we cannot be certain how well her body took the vaccine." (Test. of Jane Doe #1, at 56).

75. Jane Doe #1's daughter has had an IEP since kindergarten. (*Id.* at 56-57).

76. The most recent IEP for Jane Doe #1's daughter was modified to include protections for her, including having the daughter remain in the same classroom for the whole day and that anyone working directly with her must be masked. (*Id.* at 58). However, this IEP limits Jane Doe #1's daughter's movements around the school and prevents her from attending school programs including "adaptive gym, adaptive music, adaptive art." (*Id.*). Jane Doe #1 stated that these programs are significant to her daughter and are "a large part of the school experience for a student like her." (*Id.* at 59, 60).

77. If everyone in the school was "mandatorily masked", Jane Doe #1 testified that she would "loosen the restrictions that [she] put in place" and that her daughter would be able to take the gym, music, art, and other programs that she previously attended. (Test. of Jane Doe #1, at 59).

78. During the prior school year (2020-2021), all students were required to be masked at DVSD. (*Id.* at 62).

79. Jane Doe #1 testified that she controls her daughter's interactions with people outside of the school "very carefully" and that her daughter "does not interact with unmasked people, unless there's no other option." (*Id.* at 66).

80. Plaintiff John Doe #1 testified that he also lives in the DVSD and has an 11-year old daughter in sixth grade and a 13-year old son in eighth grade.  (Test. of John Doe #1, at 69).  Only his son has been vaccinated.  (*Id.*).

81. John Doe #1 testified that, if one or both of his children contracted COVID-19, "we have a great worry they could be, not only quarantined, but also hospitalized and, eventually, on a ventilator. . ."  (*Id.* at 70).

82. Both of John Doe #1's children wear masks both inside and outside of school.  (*Id.* at 72).

83. Neither of John Doe #1's children have a disability, a 504 Plan, or an IEP.  (*Id.* at 71-72).

84. Jane Doe #2 testified that she lives in the DVSD and has an 11-year-old daughter in fifth grade and 16-year-old son in eleventh grade. (Test. of Jane Doe #2, at 80-81). Only her 16-year-old son is vaccinated. (*Id.* at 81).

85. Jane Doe #2's daughter tested positive for COVID-19 in August, 2021, was quarantined for fourteen days, and missed the first five days of this school year.  (*Id.*). Jane Doe #2 believes her daughter contracted COVID-19 at a DVSD School Board meeting where most individuals were not wearing masks.  (*Id.* at 81-82).

86. The COVID-19 symptoms that Jane Doe #2's daughter experienced included low oxygen levels ("anywhere between 90 and 95"), fever ("anywhere between 103 and 105"), extreme sore throat, and exhaustion.  (Test. of Jane Doe #2, at 82-83).

87. After eight weeks, the daughter continues to suffer from exhaustion, has a lingering cough, and has problems remembering ("brain fog").  (*Id.* at 83-84).

88. Jane Doe #2's daughter wears a mask at school and during her dance classes after school.  (*Id.* at 84).

89. Jane Doe #2's daughter suffers from asthma. (Test. of Jane Doe #2, at 83).  She does not have a disability, 504 Plan, or IEP.  (*Id.* at 86).

90. John Doe #2 has a six-year old daughter in first grade in the DVSD.  (Test. of John Doe #2, at 88).  She is unvaccinated. (*Id.*).

91. John Doe #2 testified that he is concerned for the safety of his daughter as well as the risk of her transmitting COVID-19 to his toddler at home.  (*Id.* at 89).

92. John Doe #2's daughter does not have a disability, a 504 Plan, or an IEP.  (*Id.* at 91).

93. Jane Doe #3 lives in the DVSD and has two children who attend school in the District: a nine-year old in fourth grade and an eleven-year old in sixth grade.  (Test. of Jane Doe #3, at 92). Neither child is vaccinated.  (*Id.*).

94. The sixth grader was quarantined during the "first or second week of October" due to exposure to COVID-19 through a friend of his.  (*Id.* at 92-93).

95. Jane Doe #3's younger son has "a digestive issue" as well as an IEP for speech.  (*Id.* at 93, 95).

96. Jane Doe #3 has requested, but not yet received, a 504 Plan for her older son, who suffers from "juvenile polyposis syndrome."  (Test. of Jane Doe #3, at 95, 96).  Jane Doe #3 does not know whether this syndrome increases the risk of COVID-19.  (*Id.* at 96).

97. Jane Doe #3 explained that if her son was infected with COVID-19, "[n]ot only would he be sick, but he's high risk because of his digestive issues."  In addition, the family lives with Jane Doe #3's parents, and her stepmother is a cancer survivor and therefore at high risk.  (Test. of Jane Doe #3, at 93).

## III. ANALYSIS and CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 where Plaintiffs have raised federal law claims under the ADA, Section 504 of the Rehabilitation Act, and the First, Fifth, and Fourteenth Amendments of the United States Constitution.[3]

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction.[4] In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood

---

[3] As addressed, *infra*, the Court rejects the defendants' arguments that the Plaintiffs do not have standing in this case, thereby depriving this Court of jurisdiction.

[4] The standard for granting a preliminary injunction under Rule 65 is the same as that for issuing a TRO.  *Pileggi v. Aichele,* 843 F.Supp.2d 584, 592 (E.D. Pa. 2012) (citing *Bieros v. Nicola,* 857 F.Supp. 445, 446 (E.D. Pa. 1994)).

that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'" *McNeil Nutritionals*, *LLC v. Heartland Sweeteners*, *LLC*, 511 F.3d 350, 356-357 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).

When requesting preliminary equitable relief, the movant "must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these two "gateway factors" are met, a court should then consider the other two factors and determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*.

"District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.' . . . Indeed, '[t]he essence of equity jurisdiction has been the power of the [court] to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Reilly*, 858 F.3d at 178-179 (internal citations omitted).

In the present case, Plaintiffs' Complaint asserts claims under the ADA (Count I), Section 504 of the Rehabilitation Act (Count II), the First, Fifth, and Fourteenth Amendments

of the United States Constitution (Counts III-V), and a state law claim under the Pennsylvania Constitution (Count VI).  The Court will first address the likelihood of success on the merits as to each claim in turn, and then turn to the other elements necessary to obtain preliminary injunctive relief.[5]

## A. Likelihood of Success on the Merits

### 1. Standing

Defendants contend that Plaintiffs lack standing to bring the present action.  The Court thus first addresses this threshold issue.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).  The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.*  An "'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation."  *Already, LLC. v. Nike, Inc.*,

---

[5] Although the Court will address Plaintiffs' claims under the ADA, Rehabilitation Act, Fifth and Fourteenth Amendments, and state law constitution, the Court will not address herein Plaintiffs' First Amendment claim.  Count V of Plaintiffs' Complaint sets forth a § 1983 claim for a violation of  Plaintiffs' First Amendment Right to freedom of association.  (Doc. 1, at ¶¶ 164-169). Plaintiffs assert that Defendants deprived them of their right to free association where Plaintiffs "can no longer associate safely, or potentially at all, because of Defendant's unilateral revocation of the existing policy of following governmental and other entity guidance, yet they are required under compulsory education laws to attend school."  (Doc. 1, at ¶ 166). However, Plaintiffs do not address their First Amendment claim in their motion or brief in support of their request for a TRO and preliminary injunctive relief (*see generally*, Doc. 6).  Nor did Plaintiffs' counsel address, or reference, the First Amendment claim during oral argument following the preliminary injunction hearing.  It thus appears to this Court that, while Plaintiffs assert a First Amendment claim in their Complaint, they do not move for preliminary injunctive relief on the basis of this claim.  The Court therefore declines to address the likelihood of success on the merits of this claim and, in any event, without further information, is unable to determine what irreparable harm, if any, Plaintiffs would suffer should they not be granted preliminary injunctive relief on the basis of their First Amendment claim.

568 U.S. 85, 90-91 (2013) (quoting *Alvarez v. Smith,* 558 U.S. 87, 92 (2009)).  "The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'"  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)).

It is well settled that three elements must be satisfied to meet "the irreducible constitutional minimum of standing": (1) a "plaintiff must have suffered an injury in fact - an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *United States. v. Hays*, 515 U.S. 737, 742-743 (1995).  A plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these three elements.  *Spokeo, Inc.*, 136 S.Ct. at 1547. Where a plaintiff seeks prospective relief, "the plaintiff must show that he is likely to suffer future injury from the defendant's conduct" in order to establish standing.  *McNair v. Synapse Gp., Inc.*, 672 F.3d 213 (3d Cir. 2012) (internal quotation marks omitted).

Defendants contend that Plaintiffs lack standing to bring the present action, setting forth a number of similar and repetitive unmeritorious arguments.[6]

---

[6] In addition to the arguments set forth herein, Defendants' briefs in opposition to the motion for a TRO and preliminary injunctive relief also argue that Plaintiffs lack standing because "they have failed to identify themselves or give any information about themselves, or their alleged disabilities, other than some vague generalizations in the Complaint and Brief."  (Doc. 17, at 5).  These assertions are now without any merit where the Court has ordered Plaintiffs' counsel to inform Defendants' counsel of the identities of the Plaintiffs (*see* Doc. 23), and the parent-Plaintiffs each testified at the preliminary injunction hearing.

Here, Defendants seemingly conflate the standing requirement that a plaintiff have an injury-in-fact and the standard for determining whether a plaintiff has, in fact, stated a claim.  Defendants argue that "Plaintiffs can present no evidence that the Policy distinctly affects them" and that their "alleged injuries suffered as a result of other students not wearing a mask are completely speculative, and identical to every other student at Delaware Valley School District."  (Doc. 17, at 5).  (*See also*, Doc. 18, at 8 (arguing that "a plaintiff's injury must be individualized rather than collective" and that "Plaintiffs do not demonstrate that the Policy distinctly affects them.")).  Defendants similarly assert that Plaintiffs "have presented nothing to establish an actual injury" (Doc. 17, at 5) and that Plaintiffs have "failed to demonstrate an invasion of a legally protected interest" where "Plaintiffs have no legally protected interest in being free from an increased risk of contracting COVID-19." (Doc. 18, at 4).

It is well-established that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction", *Warth,* 422 U.S. at 499, and that a generalized grievance against allegedly illegal governmental conduct is therefore not sufficient for standing to invoke the federal judicial power, *Hays,* 515 U.S. at 743. Nonetheless, "to deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody," and therefore "standing is not to be denied simply

because many people suffer the same injury." *U.S. v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 687-688 (1973).

In addition, this Court "recognize[s] that '[t]he question whether there is an injury quickly becomes blended with the question whether to recognize the asserted interest that has in fact been impaired.'" *Archer v. York City Sch. Dist.*, 2014 WL 12884086, *5 (M.D. Pa. 2014) (quoting 13A Charles Alan Wright et al., Federal Practice & Procedure § 3531.4 (3d ed.)).

> However, the Supreme Court has rejected the "legal interest" test, which goes to the merits of a plaintiff's claim, as the predicate to establish standing. *See Association of Data Processing Servs. Orgs., Inc. v. Camp*, 397 U.S. 150, 153-54 (1970). Indeed, for purposes of determining Article III standing, we must assume *arguendo* the merits of a plaintiff's legal claim, being careful not to conflate the requirement of an injury-in-fact with the constitutional validity of a claim. *See generally Parker v. District of Columbia*, 478 F.3d 370, 376-78 (D.C. Cir. 2007) (explaining that, "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." (quoting *City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003) (internal quotation marks omitted))).

*Id*.

In the present case, Plaintiffs have alleged that the specific action of the School Board at issue here, i.e., its approval of the "Motion of the Duly Elected Members of the Delaware Valley School Board Regarding Face Coverings in School Entities", would harm them in that it is in violation of the Pa. DOH Order and puts them at a direct, and increased, risk of contracting COVID-19.  Although this harm may be suffered equally by all students within the School District, Plaintiffs' allegations are sufficiently specific as to the alleged

invasion of their legal protections and of the threat of harm and injury that they may imminently suffer so as to establish standing.

Furthermore, the Third Circuit recently clarified that, for purposes of establishing an "injury" for Article III standing, a breach of a statute is sufficient to cause a cognizable injury, and thus to permit individuals "to sue to remedy violations of their statutory rights, even without additional injury." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 635-641 (3d Cir. 2017); *see id.* at 635 ("The Supreme Court has repeatedly affirmed the ability of Congress to cast the standing net broadly and to grant individuals the ability to sue to enforce their statutory rights.") (internal quotation marks omitted).  As such, it is beyond dispute that any disabled Plaintiff has standing to sue pursuant to the ADA and Rehabilitation Act.

However, Defendants further argue that "Plaintiffs fail to demonstrate any concrete and particularized injury" where "Plaintiffs' Complaint fails to allege that any of the children actually suffer any disability recognized under the ADA."  (Doc. 18, at 5; *see also*, *id.* at 5-7). Although sparse, Plaintiffs' Complaint sufficiently alleges that "one or more of the children are disabled and medically fragile, with medical conditions which place them at high-risk. . ." and that "one or more children with disabilities are limited in where they may go in the school building, are prevented from moving in the hallways and prevented from attending classes, including art, music, and gym."  (Doc. 1, at ¶ 25).  This allegation is directly supported by the testimony of Jane Doe #1.  Additionally, such argument by Defendants

goes only to Plaintiffs' ADA and Section 504 claims, and ignores Plaintiffs' standing to

pursue their federal and state constitutional claims.

In the present case, Plaintiffs assert that the action of the School Board of Directors

has violated the constitutional and statutory rights of the minor-Plaintiffs by unlawfully

enacting a policy contrary to applicable law and by subjecting Plaintiffs to an unsafe

environment and depriving them of the reasonable accommodations to which one or more

of them is entitled.  Such claims, and the allegations set forth in the Complaint in support of

the claims, are sufficient to meet the standing requirements that a plaintiff must have

suffered an injury in fact, there exists a causal connection between the injury and the

conduct complained of, and that it is likely that the injury will be redressed by a favorable

decision, *see Hays*, 515 U.S. at 742-743.

## 2. Plaintiffs' Substantive Due Process Claim (Count III)

Having determined that the plaintiffs having standing in the present case, the Court

will begin its analysis of Plaintiffs' claims with the Substantive Due Process claim, set forth

in Count III of the Complaint.  Count III alleges a violation under 18 U.S.C. § 1983 of

Plaintiffs' substantive due process rights under the Fifth and Fourteenth Amendments.

(Doc. 1, at ¶¶ 149-157).

> Section 1983 provides remedies for deprivations of rights established by the
> Constitution, including substantive due process under the Fourteenth
> Amendment.   To state a § 1983 claim, a plaintiff must demonstrate the
> defendant, acting under color of state law, deprived plaintiff of a right secured
> by the Constitution or the laws of the United States.  Accordingly, the first step
> in evaluating a section 1983 claim is to identify the exact contours of the

> underlying right said to have been violated and to determine whether the
> plaintiff has alleged a deprivation of a constitutional right at all. Furthermore,
> the core of the concept of due process is protection against arbitrary action and
> only the most egregious official conduct can be said to be arbitrary in the
> constitutional sense.

*Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (internal citations, quotation marks, and

brackets omitted).  "As a general matter, the [Supreme] Court has always been reluctant to

expand the concept of substantive due process because guideposts for responsible

decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. City of*

*Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).  Consequently, courts must be careful to

observe "the Supreme Court's repeated warnings against an overly generous interpretation

of the substantive component of the Due Process Clause."  *Fagan v. City of Vineland*, 22

F.3d 1296, 1306 n.6 (3d Cir. 1994).

Here, it is undisputed that the Defendant Delaware Valley School District and the

individual defendants acting in their capacity as members of the Board of Directors of the

DVSD, were acting under color of state law.  The Court thus turns to the contours of the

underlying rights Plaintiffs allege were violated.

Plaintiffs assert that they have "constitutionally protected interests in the benefits that

come from the universal mask policy that was rescinded by the School Board vote, including

the ability to pursue a safe and healthy education."  (Doc. 1, at ¶ 155).  Plaintiffs further

allege:

> Defendants' vote in contradiction of the requirement to follow CDC, PADOH
> and PDE and other entity guidelines on universal masking unlawfully deprives

> Plaintiffs of these and other constitutionally-protected interests without due process of law.  Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Board's own policies and other applicable laws.

(*Id.* at ¶ 156).  Plaintiffs' brief in support of its motion for a TRO and preliminary injunctive relief additionally asserts that "in seeking redress under § 1983, Plaintiffs allege a deprivation of their children's Fourteenth Amendment property rights to education in a safe and healthy environment, as provided by the Pennsylvania Constitution."  (Doc. 6, at 43).

As to Plaintiffs' claim that the right created by Pennsylvania law entitles them to relief under the Fourteenth Amendment, the distinction between procedural due process and substantive due process is dispositive.  In *Shuman ex rel. Shertzer v. Penn Manor School District*, the Third Circuit recognized that the plaintiff had a legitimate claim of entitlement to a public education under state law that was protected by the Fourteenth Amendment Due Process clause.  422 F.3d 141, 149 (3d Cir. 2005).  However, the correlation between a right created by state law and the Fourteenth Amendment relates to *procedural* due process.  *See Goss v. Lopez*, 419 U.S. 565, 577 (1975); *Shuman*, 422 F.3d at 149.

> In contrast to procedural due process rights, which may be derived from state law, '[s]ubstantive due process rights are founded not upon state law but upon deeply rooted notions of fundamental personal interests derived from the Constitution.'" *Nunez v. Pachman*, 578 F.3d 228, 233 (3d Cir. 2009) (quoting *Nilson v. Layton City*, 45 F.3d 369, 372 (10th Cir. 1995)); *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) (explaining that procedural due process protects certain interests even though those interests are "derived from state law rather than the Constitution," but "substantive due process rights are created only by the Constitution").

*Steele v. Cicchi*, 855 F.3d 494, 501 (3d Cir. 2017).  The foregoing authority thus clearly establishes that Plaintiffs cannot base their Fourteenth Amendment substantive due process claim on the right of entitlement to a public education established under Pennsylvania law.  Because Plaintiffs do not assert a claim under the procedural due process clause, their reliance on state law to support a Fourteenth Amendment claim cannot succeed.

The Court therefore looks to the personal interests derived from the U.S. Constitution which may give rise to Plaintiffs' Fourteenth Amendment substantive due process claim.  In evaluating a substantive due process claim, a court must determine whether a government's intrusion on an individual's liberty interests is justified by adequate state interests.  An infringement on a "fundamental" constitutional right is subject to a heightened or "strict" level of judicial scrutiny, whereas an encroachment on other rights or liberties must be analyzed under "the traditional standard of review, which requires only that the [challenged state action] be shown to bear some rational relationship to legitimate state purposes."  *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 37-40 (1973).  *See also*, *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (where the asserted right is not a fundamental interest protected by the Due Process Clause, the Constitution requires that the state action "be rationally related to legitimate government interests.").

It is well-established that public education is not a constitutionally protected fundamental right or liberty under the U.S. Constitution. *San Antonio Indep. Sch. Dist.*, 411

U.S. at 37; *Plyler v. Doe*, 457 U.S. 202, 221 (1982).  Therefore, in light of the Supreme

Court's repeated holdings that education is not a fundamental right, it must logically follow

that "the ability to pursue *a safe and healthy* education" (Doc. 1, at ¶ 155)(emphasis added)

as claimed by Plaintiffs, cannot be considered a fundamental right or liberty interest.  Nor

have Plaintiffs identified any other interest which may be deemed "fundamental".

Nonetheless, while not a fundamental right, a child has the right to a public

education, and such right is afforded constitutional protection.  *See e.g.*, *Plyler,* 457 U.S. at

221 ("Public education is not a 'right' granted to individuals by the Constitution.  But neither

is it merely some governmental 'benefit' indistinguishable from other forms of social welfare

legislation.  Both the importance of education in maintaining our basic institutions, and the

lasting impact of its deprivation on the life of the child, mark the distinction.") (internal

citation omitted).[7]

Assuming that Plaintiffs have properly asserted a non-fundamental constitutionally

protected interest, including their right to a public education and specifically a right to an

education in a "safe and healthy environment", the Court applies a rational basis test.  *Cf.*

*Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 458, 461-462 (1988) (rejecting "proposition

that education is a 'fundamental right' . . . which should trigger strict scrutiny when

---

[7] Plaintiffs have not presented any case law for the proposition that a vote by a public-school entity which contradicts a lawful state order or state law necessarily gives rise to a federal constitutional claim. Although this Court does not dismiss the argument that a cause of action may exist where a local or municipal entity enacts a policy which is not in compliance with, or violates, a state law or order, this does not necessarily constitute a federal cause of action, let alone rise to the level of a federal constitutional violation which may form the basis for a federal cause of action.

government interferes with an individual's access to it" and instead finding that the

"appropriate test" is whether the statute "bears a rational relation to a legitimate government

objective.").

Where the validity of the act at issue is legislative, as it is here, "substantive due

process typically demands that the act be rationally related to some legitimate government

purpose."[8] *Nicholas v. Penn. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000); *N.J. Retail*

*Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 398 (3d Cir. 2012) ("Substantive due

process contains two lines of inquiry, one that applies when a party challenges the validity of

a legislative act, and one that applies to the challenge of a non-legislative action.  In a case

challenging a legislative act, . . . the act will withstand scrutiny if (1) there is a legitimate state

interest that (2) could be rationally furthered by the statute.").  *See also, Harrah Indep. Sch.*

*Dist. v. Martin*, 440 U.S. 194, 198 (1979) ("The School Board's rule is endowed with a

presumption of legislative validity, and the burden is on respondent to show that there is no

rational connection between the Board's action and its conceded interest . . .").

"The rational basis test, although not a toothless one, requires significant deference

to the legislature's decision-making and assumptions.  Those attacking the rationality of the

---

[8] The Third Circuit has explained that "[t]o be legislative . .  the act in question must be both substantively and procedurally legislative in nature.  An act is substantively legislative if it involves policy-making of a general purpose or line-drawing.  It is procedurally legislative if it is undertaken by means of established legislative procedures."  *In re Montgomery Cnty.*, 215 F.3d 367, 376 (3d Cir. 2000).  In the present case, the School District's actions and approval of the resolution regarding mask exceptions was done for the general purpose of policy-making, was applicable to all students in the school district, and was further undertaken by means of its established legislative procedures.

legislative classification have the burden to negative every conceivable basis which might support it." *N.J. Retail Merchants Ass'n*, 669 F.3d at 398 (internal citations and quotation marks omitted).  In addition, rational basis scrutiny limits a court's inquiry "to whether the law rationally furthers *any* legitimate state objective.  It is enough that the State offers a conceivable rational basis for its action, and the court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the provision under attack.  It is constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 367 (3d Cir. 2012) (internal citations and quotation marks omitted) (emphasis in original).  Otherwise stated, rational basis is "a very deferential standard, under which 'a law will be sustained. . . even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.'"  *English v. Bd. of Educ. of Town of Boonton,* 301 F.3d 69, 82 (3d Cir. 2002) (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)).  *See also*, *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 216 (3d Cir. 2013) (when evaluating "whether a state action is rationally related to a legitimate state interest," the Court is "free to consider any conceivable purpose and [is] not limited to considering only the goal stated by the state actor.") (internal quotation marks omitted).

Preliminarily, although Plaintiffs argue that the CDC, Pennsylvania Department of Health, and Pennsylvania Department of Education "have a compelling and legitimate interest in protecting the health, safety, and well-being of school children and the public

against the COVID-19 health crisis" and therefore had a rational basis for the issuance of their "Orders" (Doc. 6, at 31), the instant action is a challenge to the *DVSD Board of Directors'* approval of their motion with respect to the implementation of the Pa. DOH's Order.  At issue is not the basis or reasoning underlying the federal or state orders, only the School District's resolution.  Nor do Defendants challenge the validity of the CDC's Order regarding mandatory masking on school buses or the necessity of its implementation.  (*See e.g.* Prelim. Inj. Hr'g, P-18 (Medical Exception Request form stating that "[t]his exception only applies to masking within schools [and m]asks are still required on school buses"); Test. of Bukaj, at 132).[9]

At issue here, then, is the propriety of the School Board's adoption of a resolution purporting to implement and comply with the Pa. DOH Order regarding masking and, in particular, its application of the Order's language set forth in §3.B which provides for an exception "[i]f wearing a face covering would either cause a medical condition, or exacerbate an existing one, including respiratory issues that impede breathing, a mental health condition or a disability."

---

[9] At oral argument following the evidentiary hearing, Defendants' counsel did challenge the lawfulness of the Pa. DOH's Order.  Defendants' argument was limited to the ability of the Pa. DOH Acting Secretary's authority to issue this Order and did not challenge the reasoning or interests of the state in issuing the Order.  The Court need not address the lawfulness of the Pa. DOH's Order where the Court finds that, for purposes of the substantive due process analysis, even assuming the Order is valid, Plaintiffs have not met their burden of demonstrating that they are entitled to preliminary injunctive relief.  The Court further notes that, while not dispositive, the DVSD Board of Directors, when drafting and approving their motion, assumed the validity of the state Order and purportedly specifically tailored their motion and the language therein to comport with the Pa. DOH Order and the exceptions set forth in that Order.

A careful reading of the text of §3 of the Pa. DOH's Order leaves no question that it does not expressly require that a request for an exemption under §3.B necessitates the submission of supporting medical proof such as the written statement of a licensed physician or other licensed health care professional to support the request for an exception from the mask wearing requirement.  As a result, here, the Board of Directors' motion and resulting resolution, and the document implementing it and requiring a parent/guardian signature (Prelim. Inj. Hr'g, P-18), permits the minor child's parent/guardian to attest that the wearing of a mask by the child in question would cause, or exacerbate, a medical condition. The attestation of the parent/guardian when signing the form is made subject to the penalties relating to unsworn falsification to authorities, *see* 18 Pa. C.S.A. § 4904.

The DVSD School Board's resolution and the medical exception request form that it has generated, while subject to legitimate criticism that it is not the most prudent or the safest application of the Pa. DOH Order, cannot be said to be in violation of the Order's mandate or the exceptions set forth therein to the face covering mandate.  To be sure, the Order of the DOH Secretary requires a determination that wearing a face covering would "*cause*" a medical condition or "*exacerbate*" an existing one, a determination that is best made, and in some circumstances can only be made, by a licensed medical provider. However, the Acting Secretary did not see fit to include a requirement that the issues of causation of a medical condition or the exacerbation of an existing one must be made by an individual with licensed medical expertise.  In that circumstance, this Court, in resolving

Plaintiffs' substantive due process claim, must determine whether the School Board's

decision *not* to require a request for an exemption under §3.B to be accompanied by some

form of medical certification passes muster under rational basis review, and in particular

whether there is any rational connection between the Board's action and a legitimate

government purpose.

There is no question that a school district has a legitimate interest in protecting the

health and safety of its students and has the authority to enact measures to further this

interest.  A school district may further have a legitimate interest in ensuring that a child's

parents/guardians are able to retain some level of control over their own child's health and

well-being while attending school.

Here, the DVSD Board of Directors' motion explains the basis for its approval, in

part, as follows:

> Whereas significant other physical and mental health conditions [including
> asthma and ADD] and/or disabilities exist in the Delaware Valley School District
> and, . . .
>
> Whereas, in the various Policies of the Delaware Valley School Board (see
> Section 900) it is understood that the ultimate responsibility for the health and
> safety of each child rests with their parents' decisions concerning their child's
> individual circumstances. . .

 (Prelim. Inj. Hr'g, P-16, at 1-2).

In support of their motion for injunctive relief, Plaintiffs called only two School Board

members, Dawn Bukaj and Jack Fisher, who were among the five members who voted for

the motion, and resolution, in question.  Both School Board Directors who testified indicated

a well-supported belief that COVID-19 is a real and transmissible virus.  Bukaj stated that

she "believe[s] COVID is real" and that "it's very infectious."  (Test. of Bukaj, at 110). She

also explained that a student infected with COVID-19 could suffer "anywhere from the

sniffles and fever and flu-like symptoms" and "can get very sick from it, if they have

underlying conditions."  (*Id*. at 106).  Fisher testified that masking helps prevent the

transmission of COVID-19 and elaborated that this was the reason that "we. . . agreed to

the Department of Health's Order."  (Test. of Fisher, at 181-182).

In further explaining her decision, Bukaj stated that "[o]ne of the things that weighed

heavily" in her decision to vote in favor of the School Board's September 28, 2021 motion

"was parents who were unable to get medical notes from their doctors. . ."  (Test. of Bukaj,

at 122).  She also set forth her purported personal knowledge that "some doctors . . .

because of the group they work for, they've been given a directive that they can't provide

mask exemptions, probably, liability issues, I would assume."  (*Id.*).

Thus, the language of the resolution, as well as the testimony presented to this

Court, demonstrates that, in passing the resolution, the Board of Directors were aware of

the health risks posed by COVID-19 and had several rational bases for making their

determination, namely, (1) a belief that it is the province of a parent or guardian, not the

school board, to make decisions about their child's "circumstances", including their belief

that a parent is in the best position to determine whether a face mask would cause a

medical condition, or exacerbate an existing one; (2) concern that a child who needs a mask

exception may be unable to obtain medical documentation to support such a request because of a doctor's concern over issues of liability; and (3) overall considerations for the health of the students as a whole.  Nothing in the testimony or evidence provided indicates that the School Board members, in voting for the resolution, flatly and without support denied the existence of COVID-19 or were not educated as to the virus, were unaware of the risks COVID-19 poses, its transmissibility or contagiousness, or did not consider the advantages and disadvantages of masking and of providing exceptions to masking, on the student body.  Although Plaintiffs may be correct that the Board's decision is not supported by scientific evidence and that the decision places students at a higher risk of being infected with COVID-19, and they have presented substantial evidence to support both contentions, it is not for this Court to substitute its own judgment for that of the elected representatives of the School Board.  *See F.C.C v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

Furthermore, while Plaintiffs assert that the School Board's resolution is not in compliance with the Pa. DOH Order, as previously set forth herein, the Pa. DOH Order does not affirmatively require that a requested exception be supported by medical documentation. Rather, whether intentionally or not, the State's Order left the school districts with the discretion to determine whether they wanted medical documentation when considering whether the grant a request for an exception to the masking mandate.  While the exception

does not foreclose a school district from requiring medical documentation, it can also not be said to require such documentation.

Plaintiffs' argument that the Pennsylvania Secretary of Education's September 10, 2021 "Directive" clarified any ambiguity in the Pa. DOH Order and that the DVSD is now required to comply with this "Directive" is also unpersuasive.  There is no support for defining a document issued by the Pennsylvania Department of Education, which describes itself as a "letter" whose stated goal is to provide "[a] few brief updates" (*see* Prelim. Inj. Hr'g, P-13), as a "Directive."  Furthermore, Plaintiffs have provided no explanation why this Court, or the School District, should give deference, let alone strong deference, to the interpretation of one agency of another agency's Order or how such an interpretation by the Department of Education has the force of law such as to mandate how the school district must implement, and enforce, the Department of Health's Order.  To this Court's knowledge, the Pennsylvania Department of Health has never sought to clarify, or provide any guidance, on its own Order, despite being able to do so, and the Department of Education's unilateral interpretation of this Order is of little consequence in determining whether the DVSD Board of Directors violated the students' constitutional (or statutory) rights in voting to allow students, through their parent(s) or guardian(s), to request an exception to the Pennsylvania Department of Health's mandatory masking Order without submitting medical documentation in support of the request.

The Court acknowledges the danger that a parent or guardian opposed to the wearing of face coverings in general would seize on the absence of the need for medical evidence to seek an exception for his/her child for purely non-medical reasons.  The Court views this as a genuine and serious concern.  However, in light of the evidence set forth in this case and the deferential standard that the Court must afford the School Board's decision, that concern is outweighed by four considerations.  First, nothing in the Secretary's Order or the School District's resolution precludes the School District, through its appropriate representatives and administrators, from determining based upon other information known to them as, for example, in the records maintained by the School District with respect to each of its students, that the request lacks sufficient indicia of reliability, and, in that circumstance, rejecting the application for an exception.  Second, the School Board's resolution does not negate the School District's obligation to first adhere to the Acting Secretary's requirement that "all alternatives to a face covering, including the use of a face shield should be exhausted before an individual is excepted from this Order."[10]  To the extent that the School District has, up to now, not first exhausted the possible use of alternatives to face coverings for a student, prior to granting that student's request for an exception, it must do so.  Third, the medical exception request form is expressly made

---

[10] Bukaj implicitly admitted the limited nature of the School Board's resolution, and its intention, when stating that "the school board voted to follow the [Pa. DOH] Order, as written" and that she "would have left that up to administration to determine whether or not they exhausted everything in the Order", including whether the administration had first required the students requesting exceptions to attempt to wear an alternative to a face covering, such as a face shield, as set forth in the Pa. DOH Order, before granting them an exception to the covering requirement.  (*See* Test. of Bukaj, at 120).

subject to the penalties relating to unsworn falsification to authorities.  Fourth, the parent/guardian submitting the medical exception request has a fiduciary responsibility well-established in state law, to act in the best interests of his/her child. It is beyond peradventure that the submission by a parent/guardian of a medical exception containing deliberately false statements would violate that duty by wrongfully subjecting the child, and others in contact with him/her, to greater exposure to, and infection by, the COVID-19 virus.

Upon review of the evidence presented and the testimony at the hearing, there is not an insubstantial question as to whether the School Board's resolution is a surreptitious attempt to circumvent the intentions and spirit of the Pa. DOH Order.  But this Court cannot read into the DOH Order what is not there, and it is not within the province of this Court to assign certain intentions to the Pa. DOH in issuing its Order that the Department itself did not include in clear and unambiguous language.  Nor is it within the province of the Court to question the true motivations of the School Board members.  In undertaking a close reading of the Order, and in affording the School Board and its members the necessary level of deference, this Court must conclude that the resolution is supported by a rational basis.

Finally, aside from a finding that the School Board had a rational basis for approving the resolution at issue in this case, the Court notes an additional fundamental problem with Plaintiffs' substantive due process claim.  Plaintiffs must demonstrate by a showing significantly better than negligible that the minor-plaintiffs are not, in fact, receiving the education to which they are entitled.  *See e.g. Brach v. Newsom*, 6 F.4th 904, 924 (9th Cir.

2021) (analyzing substantive due process claim brought by parents challenging a series of orders that California had issued concerning the operations of schools during COVID-19 and noting that "Plaintiffs seem to have lost sight of the fact that this case was not brought as a class action.  Accordingly, to establish a violation of their asserted constitutional right to a basic minimum education, Plaintiffs had the burden to present sufficient evidence to establish that *their* children (or Plaintiff Z.R. himself, in the case of the one student Plaintiff) were not actually receiving a basic minimum education.")(emphasis in original).  There is no evidence here that any of the minor-Plaintiffs were deprived of their right to an education. Minor-Plaintiffs were not unable to attend school due to the rules regarding masking, and, with the exception of Jane Doe #1's daughter, there is no evidence or allegations that any Plaintiff was unable, or did not, attend and fully participate in all of his/her classes.  Nor is there any evidence at this time to support a claim that one or more of the individual minor-plaintiffs is actually being deprived of the ability to pursue an education that is "safe and healthy" (Doc. 1, ¶ 155), to the extent such right exists.

For the foregoing reasons, Plaintiffs have not shown a likelihood of success on the merits of their Substantive Due Process claim (Count III).

### 3. Plaintiffs' Substantive Due Process Claim – State-Created Danger (Count IV)

Count IV of Plaintiffs' Complaint alleges a 42 U.S.C. § 1983 Fourteenth Amendment Substantive Due Process claim pursuant to the state-created danger doctrine.

"Liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc). To meet the requirements of a state-created danger claim under the Fourteenth Amendment substantive due process clause, a plaintiff must show (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Bright v. Westmoreland Cnty.*, 443 F3d 276, 281 (3d Cir. 2006). *See also, Johnson v. City of Philadelphia*, 975 F.3d 394, 400 (3d Cir. 2020). Under the state-created danger doctrine, "the Due Process Clause can impose an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury." *Morrow v. Balski*, 719 F.3d 160, 167 (3d Cir. 2013). Under this doctrine "liability may attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process." *Id*. at 177 (emphasis in original).

Here, Plaintiffs' state-created danger claim fails at the first step in the Court's analysis.  An analysis of the first prong requires this Court to consider "the harm ultimately caused" and whether it was "foreseeable and direct".  Plaintiffs' Complaint alleges that they "were harmed and continue to be irreparably harmed by [the defendants'] unlawful acts, including by suffering irreparable harm including exposure to present and existential threats to health and safety, threat of retribution and bullying, increased risk of serious bodily injury and/or death."  (Doc. 1, ¶ 169).

Plaintiffs' allegations of harm are without support, in that there is no evidence that any of these harms have actually occurred.  Although the minor-Plaintiffs have attended school where a portion of students have received an exception to the masking requirement without submitting any medical documentation to support their request, and this may have placed Plaintiffs at a higher rate of exposure to COVID-19, there is no allegation or evidence that any minor-Plaintiff's attendance at school has caused him/her to contract the virus or otherwise become ill.  Nor can the Court find that "existential threats to health and safety" are sufficiently existing to create a harm as contemplated by the state-create doctrine.  Similarly, the *threat* of retribution and bullying, without more, is largely speculative and insufficient to reach the necessary level of "harm" here.  Rather, the harms alleged by Plaintiffs, while certainly possible and perhaps likely, consist only of future potential or threatened harms, and are thus insufficient to meet the first prong of the state-created danger prong.  *See Customers Bank v. Mun. of Norristown*, 563, F.App'x 201, 205 (3d Cir.

2014) (finding that alleged harm of "being placed in a potentially dangerous building" did not consist of harm compensable under the state-created danger doctrine because "being permitted entry into a potentially dangerous place is not a harm covered by the doctrine because the element focuses on the 'harm ultimately caused,' not harms that are potential or threatened.").  *See also Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013) (explaining that to meet the "fairly direct" requirement of the first prong of a state-created danger claim, "the plaintiff must plausibly allege that the state officials' actions 'precipitated or were the catalyst for' *the harm for which the plaintiff brings suit*.") (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997)) (emphasis added).[11]

The only act in this case which could arguably constitute an "affirmative act" for purposes of the state-created danger doctrine is the School Board's vote to allow students to obtain exceptions to the mask mandate from the School District without presenting medical documentation in support of this request.  (*See* Prelim. Inj. Hr'g, at 202) (Plaintiffs' counsel characterizing the affirmative act as "the board vote that was taken to eliminate the requirement of medical documentation.").  Even if this Court were to find that Plaintiffs have

---

[11] To the extent that Plaintiffs' allegations of harm may also be read to include mental or emotional distress as a result of the School Board's actions, this, without more, is insufficient to constitute the requisite harm in a state-created danger claim.  *See e.g. Carey v. City of Wilkes-Barre*, 410 F.App'x 479, 483 (3d Cir. 2011) (affirming District Court's conclusion that Plaintiff had failed to state a state-created danger claim and explaining that the "anxiety" Plaintiff claimed she suffered as a result of the defendant's actions did "not rise to the level of foreseeable and fairly direct harm" and that the "emotional distress alleged by [Plaintiff] is not a cognizable harm.").

satisfied the first element of the state-created danger doctrine, their claim fails at the second

element where the defendants' action cannot be said to shock the conscience.

In *Sanford v. Stiles*, the Third Circuit articulated the test by which a district court

should determine whether a state actor's behavior shocked the conscience.  456 F.3d 298

(3d Cir. 2006).  The Circuit adopted a sliding scale approach whereby "the state actor's

behavior must always shock the conscience.  But what is required to meet the conscience-

shocking level will depend upon the circumstances of each case, particularly the extent to

which deliberation is possible."  *Id*. at 310.

> The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases.  In a hyperpressurized environment, an intent to cause harm is usually required.  On the other hand, in cases where deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient. . . . We also recognize that there are circumstances involving something less urgent than a split-second decision but more urgent than an unhurried judgment.  Generally, this category will include situations in which the state actor is required to act in a matter of hours or minutes. . . . [In those circumstances,] the defendants [must] disregard a great risk of serious harm.

*Id*. at 309-10 (internal quotation marks and citations omitted).  *See Sauers v. Borough of

Nesquehoning*, 905 F.3d 711, 717-718 (3d Cir. 2018) ("The level of culpability required 'to

shock the contemporary conscience' falls along a spectrum dictated by the circumstances of

each case.  Our case law establishes three distinct categories of culpability depending on

how much time a [state actor] has to make a decision.") (internal citation omitted).  *See also,

Chainey*, 523 F.3d at 219-220 ("While the meaning of the [shocks the conscience] standard

varies depending upon factual context, merely alleging an improper motive is insufficient,

even where the motive is unrelated to the merits of the underlying decision.") (internal citations and quotations omitted).  The Third Circuit has thus summarized the levels necessary to establish conscience shocking behavior as follows: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 241 (3d Cir. 2008).

In the present case, the DVSD Board of Directors had ample time to deliberate and to make an unhurried judgment prior to voting for the resolution allowing a student to request an exception to the mask mandate without providing any supporting medical documentation.  The Court will therefore apply the deliberate indifference standard.

In the context of a state-created danger claim, the Third Circuit has "describe[d] deliberate indifference as requiring 'that a person consciously disregard a substantial risk of serious harm'", *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 427 (3d Cir. 2006) (quoting *Ziccardi v. City of Philadelphia,* 288 F.3d 57, 65 (3d Cir. 2002)) (internal quotation marks omitted), but has found that "actual knowledge" is not required to satisfy the deliberate indifference culpability standard, *see Phillips,* 515 F.3d at 242 ("Our test for whether a plaintiff has alleged that an action 'shocks the conscience' does not contain a requirement that the actor know his or her actions are 'conscience-shocking.'").  Rather, the state actor's conduct "must evince a willingness to ignore a foreseeable danger or risk."  *Morse,* 132 F.3d at 910.

The Court finds that, largely for the reasons explained in determining that the School

Board's resolution applying the Pa. DOH's Order and the exceptions therein from mask

wearing passes rational basis review, the School Board's actions in passing the resolution

do not exhibit deliberate indifference on the part of the Board.  The School Board adhered to

the text of the DOH Order which does not contain a requirement that the mask wearing

requirement be supported by verification from a licensed medical professional that the

wearing of a mask would cause or exacerbate a medical condition.  It is difficult, therefore,

for this Court to find that the School Board's action was "conscience shocking" and

"deliberately indifferent."      Thus, at the preliminary injunction stage, Plaintiffs have not

demonstrated by the requisite proof that any actual harm was the result of the School

Board's action or that the School Board acted with a degree of culpability that shocks the

conscience.  As a result, the plaintiffs' state-created danger claim does not have a likelihood

of success on the merits.  Plaintiffs are therefore are not entitled to preliminary injunctive

relief on the basis of this claim.

### 4. Plaintiffs' Pennsylvania State Constitution Claim (Count VI)

In Count VI of the Complaint, Plaintiffs assert that, pursuant to Article III, Section 14

of the Pennsylvania Constitution, "education is a fundamental right of every student and

Defendants have a duty to ensure that every student in Defendant School District is treated

equally and has the same fundamental opportunity for a 'thorough and efficient' education"

and they are being deprived of this right by Defendants' acts and omissions.  (Doc. 1, ¶¶

171-173).   Article III, Section 14 of the Pennsylvania constitution states: "The General

Assembly  shall provide for the maintenance and support of a thorough and efficient system

of public education to serve the needs of the Commonwealth."

In *Lisa H. v. State Board  of Education*, the Pennsylvania Commonwealth Court

explained that the Pennsylvania constitutional mandate "does not confer an individual right

upon each student to a particular level or quality of education but, instead, imposes a

constitutional duty upon the *legislature* to provide for the maintenance of a thorough and

efficient *system* of public schools throughout the Commonwealth."  447 A.2d 669, 673 (Pa.

Commw. Ct. 1982) (citing *Danson v. Casey*, 484 Pa. 415, 399 A.2d 360 (1979)) (emphasis

in original).   *Lisa H.* stated that the Commonwealth Court had previously recognized that the

right to a public education in Pennsylvania "is not a fundamental right but rather, a statutory

one and that as such, it is limited by statutory provisions."  *Id.* (citing *O'Leary v. Wisecup*,

364 A.2d 770 (1976)).

In dictum, the Pennsylvania Supreme Court stated in *School District of Wilkinsburg*

*v. Wilkinsburg Education Association*, that "public education in Pennsylvania is a

fundamental right.  It is required by Article III, Section 14 of the Pennsylvania Constitution."

667 A.2d 5, 9 (Pa. 1995).  However, subsequently in *William Penn School District v.*

*Pennsylvania Department of Education*, the Pennsylvania Supreme Court rejected the idea

that the nature of the right to an education under Pennsylvania law is a settled question.

170 A.3d 414, 461 (Pa. 2017).  Recognizing that its most explicit statement on the issue is

the statement in *School District of Wilkinsburg*, quoted above, the Court in *William Penn*

*School District* stated that

> In *Danson* [*v. Casey*, 399 A.2d 360 (Pa. 1979)], albeit implicitly, we rejected the notion that there was an individual right to education, a proposition that we made explicit in *Marrero v. Commonwealth*, 739 A.2d 110 (Pa. 1999) ("*Marrero II*")]. There, we approved what we characterized as *Danson*'s holding that our Constitution's educational mandate does not confer an "individual right upon each student to a particular level or quality of education." *Marrero II*, 739 A.2d at 112. The simple fact is that *none* of these cases conclusively decided the question, and to read any of them to the contrary is to confer upon them more precedential value on that question than they warrant.

170 A.3d at 461-462.

Because the Pennsylvania Supreme Court has provided no directive that can be

followed with confidence and its guidance lacks clarity, for present purposes, the Court will

assume *arguendo* that *Wilkinson's* statement of the law is applicable. However, even

assuming that the right to an education created by the Pennsylvania Constitution is

fundamental, there is no constitutionally protected right to a public education appropriate to a

student's individual needs unless the student fits within the statutory definition of "exceptional

children." *Lisa H*., 447 A.2d at 673.

The Court concludes that Plaintiffs have not shown the likelihood of success on the

merits of their claim for relief under the Pennsylvania Constitution. Plaintiffs have not shown

that the DVSD School Board's mask policy infringes on Plaintiffs' general right to a public

education – the policy itself is not exclusionary and no evidence was presented that any

minor-Plaintiff was otherwise precluded from attendance as a result of the policy. There

being no demonstrated or credibly suggested infringement on the right to a public

education, Plaintiffs have not shown that they are likely to succeed on their claimed

entitlement to relief pursuant to Article III, Section 14 of the Pennsylvania Constitution.

Further, Plaintiffs have not shown that they have a right under the Pennsylvania Constitution

to anything more than the general right to a public education.  To the extent they claim that

the mask policy infringes on a right to an education in a safe and healthy environment (*see*

*e.g.*, Doc. 1, ¶¶ 155, 162), such a right is not recognized under the Pennsylvania

Constitution and, at most, would be subject to rational basis review.  As previously

discussed, the Delaware Valley School District's mask policy satisfies that standard.

### 5. Plaintiffs' ADA Claim (Count I) and Section 504 Claim (Count II)[12]

Count I of Plaintiffs' Complaint alleges discrimination on the basis of disability in

violation of the ADA.  (Doc. 1, ¶¶ 131-139).  Plaintiffs' claim alleges that the "School Board's

vote is denying local school districts the ability to provide these similarly [*sic*] children in the

instant matter with the protections they need to attend school safely" and that "in permitting

parents the option to opt-out their children without medical documentation, the Board of

Education [*sic*] have placed the lives of medically vulnerable children who have disabilities

under the ADA in danger."  (*Id.* at ¶ 136).

---

[12] Although Plaintiffs' Complaint alleges violations of the ADA and Section 504 against all Defendants, Plaintiffs may only bring such claims against the School District, not the individual Defendants acting in their *individual* capacity.  *See Emerson v. Thiel Coll.,* 296 F.3d 184, 189-190 (3d Cir.2002) (defendants not subject to individual liability under ADA or Rehabilitation Act); *A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791, 804 (3d Cir.2007) ("Suits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals").

Count II of the Complaint alleges a violation of Section 504 of the Rehabilitation Act of 1973.  (*Id.* at ¶¶ 140-148).  The Section 504 claim under the Rehabilitation Act (hereinafter "RA" or "Section 504") alleges that the "School Board's vote is denying public health authorities the ability to provide those similarly situated children with the accommodations they need to attend school safely" and that "Defendants are refusing to provide a universal masking policy as the accommodation medically vulnerable children with disabilities need to attend school safely."  (*Id.* at ¶¶ 144, 145).

A review of these claims demonstrates that, fundamentally, Plaintiffs' ADA and RA claims both turn on the proposition that the school district *must* have a mandatory mask mandate in order to be in compliance with these statutes and, in the absence of this mandate, the school district will necessarily violate a disabled student's rights.

At the evidentiary hearing, John Doe #1, Jane Doe #2, John Doe #2 all specifically testified that their children did not have any disability, 504 Plan, or IEP.  Jane Doe #3 has requested, but not received, a 504 Plan for her older son due to "juvenile polyposis syndrome" and her younger son has an IEP for speech.  At this stage in the proceedings, Plaintiffs have only established that Jane Doe #1's daughter suffers from a disability and is subject to protection under the ADA.  Accordingly, during oral argument following the evidentiary hearing, Plaintiffs' counsel conceded that only Jane Doe #1 had an ADA and RA claim and that the other Plaintiffs "did not have any disability-type claim."  (Prelim. Inj. Hr'g,

at 201; *see* also, *id.* at 213).  The Court thus undertakes its analysis of the ADA and RA

claim only as to Jane Doe #1's daughter.

The same substantive standards apply to claims under the ADA and Section 504.

*See Ridley Sch. Dist. v. MR.*, 680 F.3d 260, 282-83 (3d Cir. 2012) ("[T]he substantive

standards for determining liability under the Rehabilitation Act and the ADA are the same.").

*See also, McDonald v. Commw. of Pa., Dept of Pub. Welfare*, 62 F.3d 92, 95 (3d Cir. 1995)

("Whether suit is filed under the Rehabilitation Act or under the [ADA], the substantive

standards for determining liability are the same.").  "Both acts prevent the discrimination of

individuals based on a disability, and have been interpreted to apply to prevent students

with disabilities from being denied a free appropriate public education by a school district."

*J.L. ex rel J.L. v. Ambridge Area Sch. Dist.*, 622 F.Supp.2d 257, 272 (W.D. Pa. 2008).

"Because the same standards govern both the [Plaintiffs'] RA and ADA claims, we may

address both claims in the same breath."  *Chambers v. Sch. Dist. of Philadelphia*, 587 F.3d

176, 189 (3d Cir. 2009).

"To establish claims under § 504 of the [Rehabilitation Act] and the ADA, a plaintiff

must demonstrate that: (1) [Plaintiff] has a disability, or was regarded as having a disability;

(2) [Plaintiff] was 'otherwise qualified' to participate in school activities; and (3) [Plaintiff] was

'denied the benefits of the program or was otherwise subject to discrimination because of

[his/her] disability.'" *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014)

(quoting *Chambers*, 587 F.3d at 189).[13]

Nonetheless, while "the same legal principles govern ADA and RA claims", this is

subject to limited exceptions, including (1) under the RA, a plaintiff must also show that the

allegedly discriminating entity receives federal funding; and (2) the statutes' respective

causation requirements differ. *CG v. Penn. Dept. of Educ.*, 734 F.3d 229, 235-236 & n.10,

11 (3d Cir. 2013). With respect to the causation elements under the ADA and RA, "the RA

allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a

program solely on the basis of disability, while the ADA covers discrimination on the basis of

disability, even if there is another cause as well." *CG,* 734 F.3d at 235-236. *See also*

*Andrew M. v. Delaware Cnty. Off. of Mental Health & Mental Retardation*, 490 F.3d 337, 350

(3d Cir. 2007) ("[a] plaintiff cannot make out an RA claim simply by proving (1) that he was

denied some service and (2) he is disabled. The state must have failed to provide the

service for the sole reason that the child is disabled."). Despite this difference, "to satisfy

either causation requirement, Plaintiffs must prove that they were treated differently based

on the protected characteristic, namely the existence of their disability." *CG,* 734 F.3d at

236.

---

[13] At the preliminary injunction hearing, Plaintiffs' counsel stated that Plaintiffs were "not seeking money damages, . . . only seeking injunctive relief in this case. . ." (Prelim. Inj. Hr'g, at 240). As a result, Plaintiffs need not demonstrate the additional element that the alleged discrimination was intentional. *See D.E.*, 765 F.3d at 269.

Here, it is beyond dispute that Jane Doe#1's daughter suffers from a disability and is entitled to the protections of the ADA and RA.  Nor is there any dispute that the DVSD receives federal financial assistance, such that it can be found liable under the RA.  Furthermore, solely in considering Plaintiffs' likelihood of success on the merits for purposes of determining injunctive relief, the Court will assume that Jane Doe #1's daughter is "otherwise qualified" to participate in school activities.  However, for purposes of obtaining injunctive relief, Plaintiff has not demonstrated that Jane Doe #1's daughter (or any other student with a recognized disability) was "denied the benefits of the program or was otherwise subject to discrimination because of [his/her] disability," *D.E.*, 765 F.3d at 269.  Otherwise summarized, Plaintiff has not established the necessary causation element under either the ADA or RA.

Jane Doe #1's daughter was arguably denied the benefits of participation in the "adaptive gym, adaptive music, [and] adaptive art" classes.  (Test. of Jane Doe #1, at 58-59).  Nevertheless, Plaintiff has failed to present any allegations, or factual support at the hearing, to demonstrate how such denial was based on her disability.

At the hearing, Jane Doe #1 testified that, the week prior to school beginning, she went to the school and modified her daughter's IEP "to include protections around her", which included her daughter being in her classroom "100 percent of the day" and that "anyone working directly with her would be masked."  (Test. of Jane Doe #1, at 58).  The School District did not mandate that her daughter had to be in self-contained placement.

(*Id.* at 62).  Jane Doe #1 also testified that her daughter is "in the care of a private duty nurse whose only responsibility is her health and safety. . . ."  (*Id.* at 60).  The record does not reflect that Jane Doe #1 requested any additional accommodations, nor is there any evidence, or allegation, that the School District denied her daughter any accommodation that she did request.

During oral argument, Plaintiffs' counsel maintained that the discrimination underlying the ADA claim "results from the fact that, because the school district took a posture that optional masking was okay, then, that forced the mother into a choice she did not want to take in limiting her daughter from access to some of the classes that give the most enjoyment and most appreciation and the best experience for her daughter.  She was deprived of those opportunities, whereas, other children in the school all had access to those same classes."  (Prelim. Inj. Hr'g, at 199).

Although it is clear that to succeed on their ADA and RA claims, "Plaintiffs must show that they have been deprived of a benefit or opportunity provided to non-disabled students or a group of students with some other category of disability, because of their disability," *CG*, 734 F.3d at 236, Plaintiffs' counsel's argument with respect to access to certain classes is unpersuasive.  In the absence of an IEP or Section 504 Plan, all other children in the DVSD are *required* to attend the classes to which they are assigned, in the various classrooms in which the classes are held.  In contrast, Jane Doe #1 has the *choice* whether to have her daughter attend classes outside of her assigned classroom.  Although

there is no question that the presence of unmasked individuals in the schools is a serious consideration which the parent of a "medically fragile" student must take into consideration, there is no allegation, or evidence, that the School District has in any way limited Jane Doe #1's daughter's ability to attend any classes she (or her parent) may choose or that the District has not worked with Jane Doe #1 to provide her with any accommodations she may deem necessary to her daughter's education and well-being.

Here, the discriminatory action alleged by Plaintiffs for both the ADA and RA claim is the School Board's vote allowing students to obtain an exception from mandatory masking without supporting documentation.  However, under the ADA, the allegations in the Complaint and evidence adduced at the preliminary injunction hearing, do not establish a showing significantly better than negligible that Plaintiff was discriminated against when the School Board passed the resolution at issue, or that a cause, let alone the sole cause, of the School District's decision and its implementation thereof was due to disability as defined under the ADA and RA.  Similarly, with respect to the RA, Plaintiff has failed to show a likelihood of success on the merits where she has not presented any allegations, or supporting evidence, that she was deprived of an opportunity to participate in the "adaptive gym, adaptive music, [and] adaptive art" classes, or otherwise discriminated against, solely on the basis of disability.

For these reasons, the Court finds that Plaintiffs have not shown a likelihood of success on the merits of their claims under the ADA (Count I) or Section 504 of the Rehabilitation Act (Count II).

### B. Extent to Which Plaintiffs will Suffer Irreparable Harm if Injunctive Relief is Denied

The Court turns to the second of the "most critical" factors in evaluating whether a preliminary injunction should issue: that it is more likely than not that the plaintiffs will suffer irreparable harm in the absence of preliminary relief, *Reilly,* 858 F.3d at 179.

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (italics in original). "A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id*. (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 154-155 (2d ed.1995)). The Third Circuit has emphasized that "'the *dramatic and drastic power* of injunctive force may be unleashed only against conditions generating a presently existing actual threat.'" *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (quoting *Holiday Inns of Am., Inc. v. B&B Corp*., 409 F.2d 614, 618 (3d Cir. 1969)) (emphasis added in *Adams*). Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)). *See also*, *Reilly*, 858 F.3d at 179 n.4 ("the

availability of money damages for an injury typically will preclude a finding of irreparable harm.").[14]

Where this Court has found that Plaintiffs have not shown a likelihood on the merits of any of their claims so as to entitle them to the extraordinary relief they seek, granting preliminary injunctive relief premised solely on the potentially harmful results of the Board of Directors' resolution is impermissible in light of the established criteria which must be met for the issuance of injunctive relief.

Furthermore, as set forth earlier in this opinion, there are other actions which the School District, through its representatives and administrators, could, and often must, take which would significantly decrease the risk of harm to the minor-plaintiffs and other students in the school.  The School Board's resolution does not *require* the School administration to automatically grant a parent/guardian's request for an exception to the mask mandate.

---

[14]  In analyzing the irreparable harm element of a preliminary injunction analysis, the Court is cognizant that "in the absence of a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed, . . . a court can[not] enter a mass preliminary injunction" and therefore a Court may be required to do an individual analysis of each plaintiff asserting irreparable harm in certain circumstances.  *See Adams*, 204 F.3d at 487.  However, such an individualized analysis is not necessary here where the requested injunctive relief, if granted to one plaintiff, would necessarily be extended to all plaintiffs, regardless of any dissimilarities among them.  As the Third Circuit reasoned in *Adams*,

> . . . [I]n many instances, the defendant will be incapable of severing its conduct towards one plaintiff from that towards another. In an injunction forbidding a town to build a wall, for example, the wall applies equally to all who are harmed by it, and only one plaintiff need demonstrate likelihood of success and irreparable harm in order to forestall construction. Likewise, if numerous riparian landowners bring suit asking for an injunction against a company dumping toxic substances into a lake, it does not matter that only one or two plaintiffs can show irreparable harm, for the court cannot possibly divine which toxics invaded which plaintiff's waterfront.

*Id*. at 489.

Instead, it merely "directs the administration to accept as a reasonable accommodation, a signed written parent/guardian request for a medical condition exception, on a form provided by the district" and states that "[n]o further documentation shall be required." (*See* Prelim. Inj. Hr'g, P-16, at 1-2). This resolution cannot, and does not, relieve the School District from first complying with the DOH Order's requirement that "[a]ll alternatives to a face covering, including the use of a face shield, should be exhausted before an individual is excepted from this Order" (Prelim. Inj. Hr'g, P-11, at §3). Thus, even if a parent/guardian submits the medical exception form provided by the District, the administrators of the School District may not approve such a request without first exhausting all other avenues of relief set forth in the Pa. DOH Order.

Additionally, at the hearing, several parents testified that although their children over the age of 11 had been vaccinated, those under the age of 12 had not yet been able to be vaccinated. Following the evidentiary hearing, the CDC approved COVID-19 vaccination for children between the ages of 5-11. Though this does not eliminate the risk of harm to the minor-plaintiffs or other school children, it may lessen the chance of a child being infected with COVID-19 as well severity of the harm a child may suffer, if infected.

While the above considerations apply to all Plaintiffs, the Court also notes that there is not an irreparable risk of harm to Jane Doe #1's daughter under the ADA and RA claims. Although the Court is deeply sympathetic to the choices that her parents must make in ensuring the safety of their child, and understands the importance of the classes which she

currently is unable to attend in furthering her development, the Court cannot find that she

would be *irreparably* harmed in the absence of injunctive relief.  Jane Doe #1's daughter

has been afforded every requested accommodation, and, as testified to at the hearing, the

parents may file a Special Education Due Process Hearing if they are unhappy with their

daughter's placement, as well as request an IEP team meeting to adjust their daughter's

placement, including what services she receives and where she receives the services.

(Test. of Jane Doe #1, at 62-64).

      As a result of the above-stated considerations, the Court finds that it is not more

likely than not that Plaintiffs will suffer imminent and irreparable harm in the absence of

preliminary relief.

### C. Extent to Which Defendants will Suffer Irreparable Harm if Injunction is Issued and the Public Interest

      Having found that Plaintiffs have not met the two "gateway factors", the Court need

not address the final two factors necessary to obtain a preliminary injunction, specifically,

the extent to which the non-moving party will suffer irreparable harm if the injunction is

issued and the public interest.  Nonetheless, these two factors weigh in Plaintiffs' favor and

the Court will briefly address them.

      Here, the School District Defendants have not set forth any evidence or basis for this

Court to find that they will suffer any harm as a result of the issuance of a preliminary

injunction.  *See e.g. Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F.App'x 550, 554

(3d Cir. 2003) ("As a matter of logic, the moving party cannot have the burden to introduce

evidence showing the harm that will be suffered by the opposing party if the injunction is issued. Rather, the moving party has the burden to show the harm it will suffer if no injunction issues, and if the non-moving party feels it will suffer greater harm or irreparable harm from the injunction, it has the burden to so demonstrate."). There is no evidence that the School District will suffer any harm if Defendants are enjoined from enforcing the resolution issued by the DVSD Board of Directors. Even if the School District did suffer some form of undetermined harm, such minimal harm is certainly outweighed by the harm Plaintiffs may suffer from the School Board's decision to not require medical documentation in support of a request for a masking exception.

In addition, a preliminary injunction does not cause harm to Defendants where it merely returns the School District to the rules it imposed during the prior school year and at the beginning of the present school year. There has been no allegation or evidence that the prior masking mandate, and the requirement that any request for an exception be accompanied by medical documentation, harmed the Defendants, or the students within the DVSD, in any manner.

With respect to the public interest, as the evidence presented at the hearing demonstrates, the injunction would serve the public interest in reducing the number of individuals infected with COVID-19, thus reducing both the rate of transmission of COVID-19, and the resulting hospitalizations, in the community. Nonetheless, the Court also recognizes the public interest in enforcing the lawful decisions of a community's elected

officials as well as the strong public interest in recognizing, and respecting, a parent's right to make decisions concerning their child's health and safety.[15]

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs have not met their burden with respect to their claim for preliminary injunctive relief.  Plaintiffs have not demonstrated that they have a likelihood of success on the merits with respect to any of their claims nor that it is more likely than not that they will suffer irreparable harm in the absence of some preliminary injunctive relief.  Although an analysis of the harm Defendants would suffer should injunctive relief issue and the public interest in the issuance of an injunction may weigh in favor of Plaintiffs' request, this is insufficient in light of Plaintiffs' failure to meet the two "gateway factors."  Plaintiffs' motion for preliminary injunctive relief in the form of an "Order Restraining the School Board of the Delaware Valley School District and the Board Members" (Doc. 5) will therefore be denied for the reasons set forth in this memorandum opinion.

A separate Order follows.


                           _s/ Robert D. Mariani_____
                           Robert D. Mariani
                           United States District Judge

---

[15] Although not directly at issue in this case, nor in any way dispositive under the facts of this case and the parties thereto, the Court notes the fundamental liberty interest of a parent to make decisions concerning the "care, custody, and control of their children" and to "direct the upbringing of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).